60525. WILLIAM ISELIN & COMPANY, INC. v. DAVIS.

POPE, Judge.

Appellant William Iselin and Company, Inc. (Iselin), a commercial factorer located in New York, brought suit against appellee D. Jack Davis, d/b/a The Fabric Shop, Inc. (Davis), alleging

that Davis, a resident of Madison County, Georgia, was indebted to it in the amount of $48,137.25 on an account assigned to it by Phillip Kramer & Brothers, Inc. (Kramer). Davis answered denying the essential allegations and that there was any indebtedness to Iselin. The case was tried before a jury and at the conclusion of the evidence the trial court ruled that Iselin had assigned Davis' accounts receivable to the Irving Trust Company (the Bank) and that the Bank, not Iselin, was the proper party plaintiff. Iselin appeals from the judgment on a verdict directed in favor of Davis and we affirm.

The record and transcript disclose that on March 10, 1971 Kramer entered into a standard factoring contract with Iselin. Kramer agreed to submit its customers' orders to Iselin so that Iselin could evaluate the credit worthiness of each customer and collect the account it approved with Iselin to assume the entire credit risk if a customer was financially unable to pay. Iselin reserved the right to charge back to Kramer, in the event a dispute with customers arose, the amount of the receivable involved if a claim, defense or offset (other than payment to Iselin) was asserted. Kramer retained discretion to ship merchandise to non-approved customers on open account at its own risk. However, if Kramer exercised this option to sell on open account terms, the contract required it to factor the sale with Iselin, which received the invoice for collection at the risk of the seller. Shipments were made to Davis on the open account basis.

On June 10 Kramer, Iselin and the Bank entered into an assignment agreement, the pertinent provisions of which were as follows:

"Whereas [Kramer] has entered into a factoring agreement with Iselin pursuant to which Iselin will purchase from [Kramer] accounts receivable of the Company, said agreement being hereinafter referred to as 'factoring agreement.'

"Whereas the Bank proposes from time to time to make loans to it, [Kramer] has agreed to provide the Bank with security for said loans and to establish a procedure for the repayment thereof;

"Now, Therefore, in consideration of the mutual covenants herein contained and other valuable consideration, receipt whereof is hereby acknowledged, the parties hereto have agreed as follows:

"1. Within 15 days after the end of each month Iselin shall render to [Kramer] and to the Bank a statement showing the net proceeds of the accounts receivable purchased by Iselin under the factoring agreement during each month. (Net Proceeds shall be computed solely by Iselin and shall mean the gross amount of accounts receivable less factoring commission and discounting after deducting all credits and discounts granted to customers on the

shortest terms indicated in each sale, and less a reserve as mentioned in the factoring contract, the amount of which to be determined and revised by Iselin from time to time.) Such statements shall disclose the settlement date upon which such net proceeds shall be available under the factoring agreement.

"2. As security for any and all loans made or to be made to it by the Bank [Kramer] hereby assigns, transfers and sets over unto the Bank all of its right, title and interest in and to all moneys and claims for moneys due or to become due under said factoring agreement consisting of net proceeds as hereinabove defined. By its acceptance of the assignment contained herein Iselin hereby undertakes to remit directly to the Bank for the account of [Kramer] the net proceeds shown on each monthly statement subject to Iselin's rights under the provisions of the factoring agreement, such remittance to be made on the settlement date appearing thereon.

"3. [Kramer] hereby irrevocably authorizes and empowers the Bank to ask, demand, receive, receipt and give acquittance for any and all such moneys hereby assigned, to endorse any checks or other orders for the payment of money payable to [Kramer] in payment thereof and, in its discretion to file any claims or take any action or proceeding in its own name or in the name of [Kramer], or otherwise, which the Bank may deem necessary or advisable in the premises. [Kramer] agrees that it will at all times hereafter at the request of the Bank make, do and execute all such further acts, agreements, assurances and other documents and instruments as shall be reasonably required to enable the Bank to collect all sums due or to become due under or in connection with said factoring agreement, according to the intent and purposes of this agreement.

"4. This agreement is to continue in effect until written notice of termination is served by any one of the parties hereto on the others, but such termination shall not affect the assignment to the Bank or the Bank's right to receive, subject to Iselin's rights under the provisions of the factoring agreement, the net proceeds of all sales for which a statement has theretofore been issued by Iselin to [Kramer] and to the Bank ."

Thus under this agreement, Kramer assigned to the Bank all of its interest in all funds or claims thereto due it under the factoring contract; and the gross amount of Kramer's accounts receivable factored by Iselin for a given month, less (or "subject to") the specified deductions and commissions due to Iselin, was to be remitted to the Bank. Only the Bank was authorized to take any legal action necessary to protect its interest in these "net proceeds." However, the instant suit was brought by Iselin to recover uncollected funds falling within the gross amount which under the

agreement it was obligated to deliver to the Bank. Yet it is clear from the record and trial transcript that Iselin did not initiate this action at the instigation or with the consent of the Bank, nor does it appear that the suit was filed on behalf of either Kramer or the Bank.

Appellant's arguments that Iselin's rights and security interest in the accounts receivable were preserved under the Uniform Commercial Code because it was entitled to "charge back uncollected collateral or otherwise to full or limited recourse against the debtor" must fail. (See Code Ann. § 109A-9—502 (2)). "[A]n assignment of accounts or chattel paper which is for the purpose of collection only" is a transaction specifically excluded from the the UCC Code Ann. § 109A-9—104 (e). However, the non-UCC law is clear that all choses in action arising upon contract, including accounts receivable, may be assigned so as to vest title and the right to sue on them in the assignee. E.g. *Chattahoochee Holdings v. Marshall,* 146 Ga. App. 658, 660 (1) (247 SE2d 167) (1978); *Andrews v. Adams Drive, Ltd.,* 142 Ga. App. 32, 33 (3) (234 SE2d 835) (1977); see Code Ann. § 85-1803.

Consequently, we are compelled to agree with the conclusion of the trial court, that under the assignment agreement the Bank was the proper party to take whatever action was necessary to protect its interest in the net proceeds, and hold that the court correctly directed a verdict in favor of the defendant Davis. See Code Ann. § 3-108.

*Judgment affirmed. McMurray, P. J., and Banke, J., concur.*

DECIDED FEBRUARY 10, 1981 —
REHEARING DENIED MARCH 4, 1981 —

*David E. Ralston, James C. Warnes,* for appellant.
*Randolph A. Rogers, D. Jack Davis, Nickolas P. Chilivis, Herbert H. Gray III,* for appellee.