## 75879. LARSON v. TANDY CORPORATION.
### (371 SE2d 663)

Beasley, Judge.

Larson appealed the grant of summary judgment against him in his suit arising from Tandy Corporation's termination of the business relationship between them.

Tandy is a nationwide retailer of electronic goods to the consumer market through a chain of stores doing business under the registered name "Radio Shack," a division of Tandy. On November 1, 1974, Larson entered into a Special Manager Incentive Agreement (SMIA) with Tandy whereby Larson agreed to manage a store for compensation equal to one-half of the adjusted gross profit of the store as computed by a specified formula and to provide the company with a $20,000 "security deposit." The agreement was for a period of two years, automatically renewable annually until either party gave notice of termination 30 days prior to the end of a fiscal year. A right of termination before the two-year period expired was also included.

After the original agreement expired in October 1976, there followed a succession of renewal agreements much like the first SMIA. The last one was for a six-month period from November 1, 1982 to April 30, 1983. Larson received written notice of his termination on June 22, 1983 for what the company stated to be difficulty in following management policies. Larson's view was that the company simply wanted to replace SMIA managers with company managers so as to increase the company's profits.

Larson sued Tandy, alleging that the SMIA was a partnership agreement, that it was terminated without notice or justification on terms which were prejudicial and damaging to him and deprived him of "his equity ownership in the business as a going concern." He maintained that Tandy's actions constituted a breach of contract, fraud in inducing him to enter into the SMIA, and unfair and deceptive business practices in violation of the Fair Business Practices Act of 1975, OCGA § 10-1-390 et seq.

1. Larson asserts that his business relationship with Tandy was a partnership because there were shared risks, expenses, and interest in profits and losses, so that Tandy could not be allowed to "arbitrarily"

dismiss him with no offer of compensation for the value of the enterprise as a going concern and for his lost benefits in future profits and income. He maintains that the unlawful termination of the partnership relationship entitles him to an accounting from Tandy based upon his fair and reasonable share in the value of the enterprise.

The original SMIA expressly provided, "It shall be understood by both Company and Manager that under the terms of this Agreement, Manager is an employee of the Company and as such enters into this Agreement individually and not as a member of any partnership, corporation, or association. Further, Company has the right of final control and direction of Manager and all employees within the Store not only in the ultimate result of the Store's performance but in all the details of the operation of the Store. The Company has the right to terminate any employee (other than Manager) in the Store immediately and the right to terminate Manager under the terms of this Agreement." The SMIA also provided that the Manager would at no time have any ownership of the store's assets other than those provided by the Manager.

This original SMIA and subsequent written agreements expressly stated the nature of the business relationship was that of employer-employee and Larson signed the documents acknowledging this. Larson's compensation by sharing in the profits would not of itself create a partnership relationship.[1]

While it is true that a partnership exists where there is a joint enterprise, a joint risk, a joint sharing of expenses, and a joint interest in the profits and losses, *Smith v. Hancock*, 163 Ga. 222, 231 (2) (136 SE 52) (1926), a partnership is not created solely by an agreement to share profits. See *Elliott v. Floyd*, 85 Ga. App. 416 (69 SE2d 620) (1952); *Falk v. LaGrange Cigar Co.*, 15 Ga. App. 564 (84 SE 93) (1915); *Dawson Nat. Bank v. Ward & Gurr*, 120 Ga. 861 (48 SE 313) (1904); *Sankey & Shorter v. Columbus Ironworks*, 44 Ga. 228 (1871).

Under the SMIAs, Larson was responsible for furnishing the security deposit and for equipment which in his opinion was necessary in the operation of the store other than that furnished by the company, while Tandy was responsible for selection and lease of a site for the store premises, selection and delivery of store fixtures, the petty cash fund, all operating and merchandising policies, merchandise inventory, selection of media and time for national and local advertising, the bank checking account, exterior signage, store hours, and the filing of all matters pertaining to the labor force including payroll preparation and compliance with labor and tax laws. Tandy and Lar-

---

[1] The parties agree that the Uniform Partnership Act (UPA), OCGA § 14-8-1 et seq. does not control because this action was filed prior to the effective date of the Act.

son were jointly responsible for selection of a local bank and for the final right of approval in determining disputes as to operating or personnel matters.

The ultimate decision-making was Tandy's. What might be termed Larson's only "risk" in the enterprise was any negative impact on the profits of the store and therefore on his compensation. The undisputed evidence is that Larson held no title, jointly or severally, to the real and personal assets of the enterprise other than that which he furnished, and that he had no right of control as owner over the profits. *Sankey*, supra. Although Larson contends that the initial $20,000 security deposit was actually used to purchase store inventory, the only evidence as to the purpose and use of the security deposit was that it was to provide the company with security for its investment, to insure the manager's faithful performance of his obligations under the agreement, and to induce the manager to obtain the best profits possible. The security deposit along with salary due were paid to Larson following the termination.

The undisputed evidence shows that the relationship was not that of a partnership as a matter of law.

2. Is there any evidence that Larson's termination constituted a breach of contract?

All written SMIAs relied upon by Larson expired by their own terms prior to his termination. Thus the claim of breach of a written agreement fails.

As for a claim of breach of any oral employment agreement, insofar as Larson maintains that to induce him to enter the original SMIA, the company represented that he would be the store manager so long as he operated the business in a profitable manner, such an oral employment agreement cannot support a claim for the recovery of damages or compensation for services not performed or for any breach of contract. *Trade City G. M. C. v. May*, 154 Ga. App. 371, 372 (2) (268 SE2d 421) (1980).

3. Larson also alleges fraud in the inducement. He claims that when he considered becoming a SMIA manager in 1974, a regional manager assured him that "the only basis for his being terminated as a SMIA would be a level of performance of his particular store which was below five percent of the national average performance of all Radio Shack stores, a level of performance which was 'completely out of the question.'" This assurance, he claims, prompted him to become a SMIA manager.

Even if such a promise of employment for an indefinite term was made, it will support a recovery limited to compensation actually earned, *Trade City G. M. C. v. May*, supra at 372 (2), which he received. In addition, such a promise cannot support a claim of fraud because it is based on a promise as to future events. *Hudson v. Ven-*

*ture Indus.*, 147 Ga. App. 31, 34 (2) (248 SE2d 9) (1978).

4. Appellant further contends that the alleged fraudulent representation constituted violation of the Fair Business Practices Act of 1975, OCGA § 10-1-390 et seq.

For conduct to be actionable under the Fair Business Practices Act, it must be within that class of conduct made unlawful by OCGA § 10-1-393 (a), which proscribes unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce. Before determining whether acts or practices are unfair or deceptive, it must be determined whether the particular activity occurred in the conduct of consumer transactions and consumer acts or practices.

The legislature intended to limit the scope of the Act to the consumer market. Its coverage is limited to activities in the conduct of consumer transactions and consumer acts or practices in trade or commerce. *Benchmark Carpet Mills v. Fiber Indus.*, 168 Ga. App. 932 (311 SE2d 216) (1983). This case does not involve a consumer transaction. OCGA § 10-1-392. Employment is not a consumer item.

Even if we accept the characterization that we are dealing with the sale of a business interest, the FBPA does not aid appellant. Application of "two factors are determinative: (a) the medium through which the act or practice is introduced into the stream of commerce; and (b) the market on which the act or practice is reasonably intended to impact. It is only when the application of both of these factors indicates that the act or practice occurred within the context of the consumer marketplace that the fairness or deceptiveness of the act or practice need be examined. This is so because an act or practice which is outside that context, no matter how unfair or deceptive, is not directly regulated by the FBPA." *Benchmark Carpet Mills v. Fiber Indus.*, supra at 934.

Here, the alleged deception was not introduced into the stream of commerce. Nor was it reasonably intended to impact on any "market" other than Larson. The FBPA does not "provide an additional remedy for private wrongs which do not and could not affect the consuming public generally." *Zeeman v. Black*, 156 Ga. App. 82 (273 SE2d 910) (1980). The Act has no applicability to Larson's claims.

5. Woven through his argument on appeal is Larson's contention that at all times of his management, he did an excellent job in adhering to company policies and in showing a good economic performance and that his termination was based upon a policy formulated by Tandy to eliminate SMIA managers in order to substitute company managers who would share less in store profits, resulting in increased income to Tandy. He maintains that the reasons given for his termination were essentially baseless and given in order to mask such policy.

Tandy submitted evidence of Larson's failure to adhere to certain policies including tardy opening of the store and permitting employees to borrow funds from the cash register. In support of Larson's contention about company subterfuge, he cites a fellow SMIA's deposition statement that the company wanted to get him (the colleague) out of his store because he was a SMIA manager and that "little things" made the fellow SMIA think that the company was "really concerned about getting rid of those franchise stores and putting in company managers to increase their share of the profit."

Larson submitted no evidence whatsoever to show a policy implemented against him to force him out, nor did he submit evidence to rebut the company's documentation of his violations of certain company policies, which would have provided reason for his termination.

*Judgment affirmed. Birdsong, C. J., Deen, P. J., Carley, Sognier, Pope, and Benham, JJ., concur. McMurray, P. J., and Banke, P. J., dissent.*

BANKE, Presiding Judge, dissenting.

I would reverse the grant of Tandy's motion for summary judgment.

By the terms of the written agreement, Tandy was authorized to "withdraw from Manager's Security Deposit . . . (4) Any loss sustained by [Tandy] by reason of Manager's failure to manage the Store and/or protect the assets of the store with a reasonable degree of care, skill and judgment; and/or, his/her failure to fulfill Manager's obligations under this Agreement." The agreement further specified that in the event the company's "total investment" in inventory and net book value of fixed assets in the store should come to exceed double the amount of the security deposit, the manager could be required to make an additional security deposit in an amount equal to 50 percent of such excess and could be held accountable for a "return on investment charge" on the amount of such excess until the additional security deposit was made. On the basis of these additional contractual terms, I believe a material factual question exists as to whether the appellant shared with Tandy a joint risk of loss as well as a joint interest in profits, with the result that, notwithstanding the language of the agreement specifying that no relationship other than that of employee-employer was contemplated, he acquired an equity interest in the business.

I am authorized to state that Presiding Judge McMurray joins in this dissent.

DECIDED JULY 5, 1988 —
REHEARING DENIED JULY 21, 1988 —

*Morgan M. Robertson*, for appellant.
*Everette L. Doffermyre, Jr.*, for appellee.