A95A0055. EASON PUBLICATIONS, INC. v. NATIONSBANK OF GEORGIA et al.
(458 SE2d 899)

BEASLEY, Chief Judge.

Eason's comptroller, Merritt, embezzled close to $1 million, in part by forging the signature of Eason's secretary/treasurer, Walsey, on a number of checks made payable to himself. Eason sought recovery from its banker, NationsBank f/k/a C&S Sovran Corporation, asserting several different claims. It appeals the grant of summary judgment to NationsBank. Central to resolution of the case is the

operation of OCGA § 11-4-406, which governs the respective responsibilities of a bank and its customers regarding improper payments and examination of bank statements.

Comptroller Merritt's duties included reconciling the monthly bank statements and supervising the payment of Eason's bills. He in turn was supervised by secretary-treasurer Walsey and president Deborah Eason. Only those two and Elton Eason were established as authorized signatories to the checking account. Merritt served as the primary day-to-day contact between Eason and the bank.

Merritt's forgeries, totaling 188 checks, spanned 1987 to December 1991 when he was fired. Some checks would have overdrawn Eason's account but for additional funds deposited at Merritt's instruction by the bank on Eason's line of credit. Although the bank's usual practice was to accept transfer direction only from the persons authorized to sign on checking accounts, both Eason and the bank considered Merritt the person responsible for the mechanics of transfers. Transfers were shown on Eason's monthly account statements and Eason showed changes in the line of credit in its financial reports. Merritt's supervisors thought the transfers went to Eason operations in other states.

Before May 5, 1989, NationsBank would compare the drawers' signatures on Eason checks to the authorized signatures on file. After that date the bank used a "bulk filing" system for processing commercial checks, which remained in place through the remainder of Merritt's forgery. Under this system, the bank compared signatures only on checks for $25,000 or more. The bank chose this threshold after an informal review of other local banks revealed that some banks had similar policies with thresholds between $2,500 and $40,000, although some banks verified all signatures. The bank did not inform its customers of this change, which affected over 98 percent of commercial checks.

After the system was instituted, the bank paid 151 checks forged by Merritt, totaling over $770,000. Because none of the checks were for $25,000 or more, no signature was examined. A document expert testified that the forgeries were easy to detect.

Eason's suit alleged negligence, fraud, violation of the Fair Business Practices Act, and breach of contract. The order granting summary judgment specifically addressed all causes of action except breach of contract.

With this background, we turn to the issues raised by the appeal.

1. A bank may charge its depositors only for those items "properly payable." OCGA § 11-4-401 (1). It may not charge an account for a forged check and is, in general, strictly liable for paying on a forged check. *Trammell v. Farmers & Merchants Bank*, 170 Ga. App. 347, 348 (1) (317 SE2d 323) (1984). When it does charge a customer for an

improperly paid item and sends the customer a statement of account showing payment, the responsibilities and liabilities of the bank and customer are governed by OCGA § 11-4-406. Eason asserts that the court misconstrued that Code section.

The customer "must exercise reasonable care and promptness" to discover forgeries and notify the bank, OCGA § 11-4-406 (1), and in certain circumstances, the bank will not be liable for forgeries if the customer did not fulfill these duties. OCGA § 11-4-406 (2). The bank will remain liable, however, if both it and the customer failed to exercise reasonable care. OCGA § 11-4-406 (3). Regardless of which party failed, the bank is not liable for any forgeries the customer does not report to the bank within 60 days of being sent a statement upon which those forgeries are reflected. OCGA § 11-4-406 (4).

These provisions operate similarly to a statute of limitation and protect the bank from facing suit over forgeries for an indefinite period of time. *Decatur Fed. Sav. & Loan v. Litsky*, 207 Ga. App. 752, 753 (1) (429 SE2d 300) (1993). When OCGA § 11-4-406 is followed properly, the bank cannot be held liable for any forgery shown on a statement it sent more than 60 days before the customer reports the forgery. As Eason correctly notes, however, to avail itself of this cutoff, the bank must first give the customer a statement showing items paid "in good faith." Eason contends the bank did not pay the forged checks in good faith.

"Good faith" is defined as "honesty in fact in the conduct or transaction concerned." OCGA § 11-1-201 (19). Contrary to Eason's contention, issues of good faith do not always present jury questions. The facts of a case determine when it is possible to declare as a matter of law whether good faith can be established. *Crosson v. Lancaster*, 207 Ga. App. 404, 405-407 (4) (427 SE2d 864) (1993).

Eason argues that the bank exhibited lack of good faith by not informing its customers of the rule change on signature verification, by agreeing to "accept and pay [those checks] bearing the signature or signatures of authorized persons" and then not checking those signatures, by shifting all practical responsibility for forgery detection to the customer, by allowing Merritt to place funds into the checking account from the line of credit, and by arranging personal loans for Merritt.

These actions do not constitute evidence that the bank paid the forged checks without "honesty in fact." OCGA § 11-1-201 (19). The transactions regarding which lack of good faith must be shown are paying the checks and debiting Eason's account. There is no evidence that the account statements did not reflect "items paid in good faith," as required by OCGA § 11-4-406 (1). The 60-day maximum set by OCGA § 11-4-406 (4) (a) applies so that summary judgment was proper as to the checks reported on statements sent more than 60

days before Eason reported the forgeries, leaving 22 checks totaling $88,499.50 in question.

The bank contends Eason failed to exercise ordinary care in examining its statements. Eason's degree of care is irrelevant if Eason can show that the bank failed to exercise ordinary care in paying the checks. OCGA § 11-4-406 (3). It is undisputed that the bank did not verify the signatures on any forged checks after May 5, 1989, including the last 22. That alone is sufficient to raise a factual issue as to the bank's exercise of ordinary care, although ordinary care is a preliminary question of law in this case because action "consistent with . . . a general banking usage . . . prima facie constitutes the exercise of ordinary care." OCGA § 11-4-103 (3). The bank contends that "bulk filing" was a general banking practice when the 22 checks were paid.

Application of OCGA § 11-4-103 (3) does not entitle Nations-Bank to summary judgment. Even if the bank showed conclusively that it complied with local industry standards, making a prima facie showing simply shifts the burden to Eason to produce rebuttal evidence that the bank did not exercise ordinary care. See *Ellis v. Curtis-Toledo, Inc.*, 204 Ga. App. 704, 705 (2) (420 SE2d 756) (1992). Eason did so by presenting expert opinion that the verification procedure used was unreasonable.

Additionally, the evidence does not establish that NationsBank was acting consistently "with general banking usage." During the period in which the last twenty-two checks were presented for payment, signature verification procedures for commercial checking accounts at five local banks varied from checking all signatures to checking only those over $40,000. It cannot be determined as a matter of law that NationsBank's policy was consistent with a "general usage" when that usage was so varied.

Eason notes that other states have declared a bank's failure to verify signatures on checks under a certain amount to be negligence as a matter of law. See *McDowell v. Dallas Teachers Credit Union*, 772 SW2d 183 (Tx. App. 1989); *Medford Irrigation Dist. v. Western Bank*, 676 P2d 329 (Or. App. 1984). Georgia law, however, does not require such a statement. A jury must determine whether Nations-Bank's verification procedures constituted ordinary care as to those last 22 checks.

2. Eason also asserts NationsBank is liable under the Fair Business Practices Act, OCGA § 10-1-390 et seq., for misrepresenting the "standard, quality, or grade" of its services. OCGA § 10-1-393 (b) (7). Such a misrepresentation is a violation of the FBPA "by way of illustration only." OCGA § 10-1-393 (b). The FBPA is violated by "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce."

OCGA § 10-1-393 (a).

NationsBank contends the Act does not cover the commercial checking account involved here. An act or practice that is introduced to the stream of commerce outside the consumer marketplace is not directly regulated by the FBPA. *Benchmark Carpet Mills v. Fiber Indus.*, 168 Ga. App. 932, 934 (311 SE2d 216) (1983). Since Nations-Bank's commercial checking accounts were not offered to consumers, its practices concerning those accounts are outside the consumer marketplace, and the FBPA does not apply. Id.; accord *Alonso v. Parfet*, 171 Ga. App. 74, 77 (2) (318 SE2d 696) (1984).

3. Eason also argues NationsBank fraudulently concealed its signature verification procedures. OCGA § 7-1-350 requires a bank to notify its customers about any changes in its rules "governing deposits or withdrawal of deposits," and similar language is found in the account agreement. NationsBank contends that despite this it had no duty to disclose the change in the verification level.

" 'Constructive fraud consists of any act of omission or commission, contrary to legal or equitable duty, trust, or confidence justly reposed, which is contrary to good conscience and operates to the injury of another.' OCGA § 23-2-51 (b). Nondisclosure may provide the basis for constructive fraud where a party is under an obligation to communicate. OCGA § 23-2-53. 'The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case,' [OCGA § 23-2-53], and whether the particular circumstances of a case give rise to an obligation to disclose will generally be a jury question. [Cit.]" *First Union Nat. Bank v. Davies-Elliott, Inc.*, 207 Ga. App. 791, 793 (2) (429 SE2d 161) (1993). Given the statute and the account agreement, it appears NationsBank was obligated to disclose the change in verification procedures.

Duty to disclose is not, however, the only element that must be shown to establish constructive fraud. " 'The tort of fraud has five elements: a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by [the] plaintiff, and damage to [the] plaintiff.' " *Baldwin v. Roberts*, 212 Ga. App. 546, 547 (2) (442 SE2d 272) (1994). There is no evidence that the bank refrained from informing its customers in order to induce them to take or refrain from taking any certain action. The only evidence concerning the bank's intention was in response to an interrogatory, that it did not inform its depositors "because publication of such information would not be in the best interests of NationsBank or its depositors." The expert in check verification practices in banks around the United States deposed that banks refrain from making this public so as not to encourage forgery. It was his opinion that making this public would increase forgeries. He also deposed that signature verification did not reveal forgeries, so that although not doing

so produces a cost savings, the reason for not verifying every signature is that it is futile. The element of inducement is not sufficiently grounded in evidence to present a claim of fraud. The absence of evidence as to this essential element of Eason's fraud compels the conclusion that the court was correct in granting summary judgment to the bank on the issue. *Lau's Corp. v. Haskins*, 261 Ga. 491, 495 (4) (405 SE2d 474) (1991).

4. Eason also contends the court improperly failed to open certain sealed depositions before awarding summary judgment. The court stated in its order that it had read "all materials submitted by the parties in connection with this motion." There is no evidence that the only copies of the depositions at issue were those now appearing in the record with a notation "opened for appeal." Additionally, the statements in the depositions which Eason contends create material issues of fact do not do so.

5. Although the court did not address Eason's claim for breach of contract, its order was clearly a grant of complete summary judgment. As Eason has not supported the breach of contract claim by argument or citation of authority, it is deemed abandoned pursuant to Court of Appeals Rule 27 (c) (2). "Accordingly, summary judgment was properly granted as to [this claim]." *Russell v. KDA, Inc.*, 206 Ga. App. 397, 400 (5) (425 SE2d 406) (1992).

*Judgment affirmed in part and reversed in part. Pope, P. J., and Ruffin, J., concur.*

DECIDED JULY 7, 1995.

*Goodman & Goodman, Dale R. F. Goodman, Donald J. Goodman*, for appellant.
*Sutherland, Asbill & Brennan, Richard G. Murphy, Jr., Ann G. Fort*, for appellees.