A98A1226. CHANCELLOR et al. v. GATEWAY LINCOLN-MERCURY, INC. et al.
(502 SE2d 799)

ELDRIDGE, Judge.

On November 29, 1993, Peggy Chancellor and Betty Mitchell, her mother, plaintiffs-appellants, entered into a written retail

installment sales contract with Gateway Lincoln-Mercury, Inc. ("Gateway"), defendant-appellee, to purchase a used 1985 Honda Prelude. The written contract showed a cash price of $4,383.50, an unpaid cash balance of $3,983.50 after deducting the $400 cash down payment, and $4,343.39 financed. The amount financed consisted of $51.55 credit life insurance, $171.88 credit disability insurance, $16.50 license, title, and registration fees, $120 for Roadguard service, $359.89 for "charges and amount paid to others on your behalf," and the balance of cash due as $3,983.50, totaling $4,343.39. The finance charge was shown as $1,384.69 at 27 percent annual percentage rate ("APR") for 24 payments of $238.67, beginning on January 13, 1994. The total payments were shown as $5,728.08. "The total cost of your purchase on credit, including your downpayment of $400.00 was $6,128.08."

Gateway provided to Mercury Finance Company of Georgia ("Mercury"), defendant-appellee, the buyer's order and plaintiffs' credit application for financing approval. In the buyer's order, the plaintiffs agreed to purchase the car for $4,450, conditioned upon credit approval. Subsequent to the execution of the buyer's order and prior to the execution of the contract, Gateway lowered the purchase price to $4,254.50. Robert Smith, Mercury's agent, approved the creditworthiness of the plaintiffs and agreed to the assignment of the contract at a discounted amount, provided Gateway closed the sale. Smith notified Gateway of the approval, the amount to be financed, the APR, and terms of the contract, as well as the discount that Gateway must accept for Mercury to take an assignment of the contract. Gateway never increased the purchase price to recoup, in whole or in part, the discount fee.

The retail installment sales contract provided in its very terms an immediate and automatic assignment from Gateway to Mercury, as soon as plaintiffs executed the contract.

After the plaintiffs executed the contract and all other paperwork, the original contract was delivered by Gateway to Mercury. Mercury inspected the paperwork and determined that Gateway had properly filled out the contract. Mercury took the assignment and then paid Gateway the face amount of the contract, less the discount of $450 for the assignment of the retail installment sales contract. Mercury retained the $450 as part compensation for financing and administering the installment sale. Mercury never gave the discount, or any portion of the discount, back to the car dealer.

The discount was deducted from the face amount of the purchase contract, i.e., price and sale of intangible rights in the contract and the total cost of the purchase on credit. Gateway considered the $450 discount as the cost of doing business with Mercury. Gateway's profit on the transaction was reduced by the discount of $450.

While Gateway is not in the business of loaning money or financing cars, it arranged for the financing in order to permit the plaintiffs to purchase the car and so Gateway could receive immediate payment. Gateway knew that there would be a discount charged by Mercury, but did not know the exact amount until Mercury approved the financing and informed Gateway of the amount prior to the execution of the contract. At no time did either Gateway or Mercury disclose to the plaintiffs that a discount of the face amount of the purchase price and intangible rights sold in the contract would be charged Gateway for the assignment by Mercury or, after the assignment, that the contract had been discounted $450.

1. Plaintiffs' first enumeration of error is that the trial court erred on summary judgment in determining that the $450 discount fee is not a finance charge that must be disclosed. We do not agree.

This contract formation constituted a five-step transaction, leading to written and oral agreements: (1) the written buyer's offer by plaintiffs, after the negotiation of the purchase terms for the used car and intangible rights with the seller, Gateway, contingent upon financing by Mercury; (2) an oral offer by Mercury to Gateway, in which Mercury agreed to finance the purchase of the used car and other intangible property rights on specified financing terms, if Gateway used the form retail installment contract which made Mercury the third party beneficiary and provided for automatic assignment to Mercury and if Gateway paid a discount fee of $450; (3) a counter-offer in writing made by Gateway to the plaintiffs in the form of the final retail installment sales contract with automatic assignment to Mercury; (4) plaintiffs' acceptance by execution of the retail installment sales contract, and Gateway's performance by delivery of the car and evidence of the intangible property to plaintiffs; and (5) acceptance and full performance by Gateway of Mercury's oral offer to Gateway by delivering the unaltered and executed retail installment sales agreement to Mercury for discounted payment.

Thus, the nature and origin of the discount fee must be determined from an analysis of the evidence: was it a finance charge, coming out of the loan proceeds only; was it part of the purchase price of the used car and intangible property sold to the plaintiffs, coming from the seller's proceeds of the sale; or was it part of the retail installment sales contract, i.e., sale of property, finance charges, and interest? Even if other lenders would receive similar treatment, such discount may well reflect only market forces at work to induce the purchase of the chattel paper. There was no evidence that on a cash purchase of the used car the plaintiffs would have received the same intangible rights for $450 less than the plaintiffs were obligated to pay under the agreement. The record shows that Gateway had already reduced the purchase price of the car $196 immediately prior

to the contract execution, and there is no evidence that further price reduction was possible. Thus, after the defendants showed from the record the absence of damages, plaintiffs had the duty to come forward with evidence and failed to present any evidence to raise an issue of fact that they were damaged by the discount fee.

Therefore, if the $450 came out of the sales price for the used car and the intangible rights sold to the plaintiffs, then such discount fee was part of the purchase price and could not be a finance charge.

The discount fee represented either the reduction from the value of Gateway's intangible property, i.e., the sales proceeds from the car and for the intangible property sold or the value of the entire retail installment sales contract, which reflected the fair market value of such intangible property when reduced to immediate cash value. OCGA §§ 44-1-3; 44-1-7.

When the plaintiffs executed the contract, Gateway acquired an inchoate right or chose in action to the sales price of $4,254.50, as well as finance charges and interest, totaling $5,728.08, which was an assignable property right and which Gateway immediately assigned to Mercury at a prearranged discount price. OCGA §§ 44-12-22; 44-12-23; 44-12-24; *Evans v. Brown*, 196 Ga. 634, 639 (27 SE2d 300) (1943); *William Iselin & Co. v. Davis*, 157 Ga. App. 739, 742 (278 SE2d 442) (1981). The "non-UCC law is clear that all choses in action arising upon contract, including accounts receivable, may be assigned so as to vest title and the right to sue on them in the assignee. E.g. *Chattahoochee Holdings v. Marshall*, 146 Ga. App. 658, 660 (1) (247 SE2d 167) (1978); *Andrews v. Adams Drive, Ltd.*, 142 Ga. App. 32, 33 (3) (234 SE2d 835) (1977); see [OCGA § 44-12-22]." *William Iselin & Co. v. Davis*, supra at 742. Gateway had the absolute right to sell such uncollected chose in action for payment of installments by the plaintiffs for whatever price that such chose in action could bring in the fair market.

Gateway, acting on its own behalf and as agent for Mercury, negotiated the sale of such chattel paper prior to the execution of the contract by the plaintiffs, because Gateway and Mercury had concurrent interests in the transaction that also coincided with the plaintiffs' interest in obtaining financing. See OCGA §§ 11-9-102; 11-9-103 (1), (3), and (4); 11-9-105 (1) (b); 11-9-107 (b); *Continental Oil Co. &c. v. Sutton*, 126 Ga. App. 78, 79, n. 1 (189 SE2d 925) (1972).

"[I]f the creditor separately imposes a charge on the consumer to cover certain costs, the charge is a finance charge if it otherwise meets the definition. For example: — A discount imposed on a credit obligation when it is assigned by the seller-creditor is not a finance charge [unless] the discount is [ ] separately imposed on the consumer. (See [12 CFR] § 226.4 (a) (2).)" 12 CFR § 226.4 (a) (1) (iii) (A) (2). In this case, under the contract, Gateway is the seller-creditor,

because Gateway sold the property on credit under the retail installment sales contract to the plaintiffs, even though it simultaneously assigned the contract without recourse at a discount to Mercury under the Truth in Lending Act ("TILA"). See 12 CFR § 226.2 (a) (17) (i).

"The finance charge includes the following types of charges . . . (6) Charges imposed on a creditor by another person for purchasing or accepting a consumer's obligation, if the consumer is required to pay the charges in cash, as an addition to the obligation, or as a deduction from the proceeds of the obligation." 12 CFR § 226.4 (b).

Such example shows that the discount fee is not a finance charge, because the plaintiffs did not have to pay the discount fee in cash as an additional obligation nor was the discount deducted from the proceeds of the obligations. The plaintiffs were to receive nothing in the way of cash at the closing of the sale, only the property they purchased. As previously pointed out, plaintiffs' financial liability was not increased by the discount fee; plaintiffs' liability was fixed, whether the discount was paid or not. Thus, Gateway, as the creditor under the retail installment sales contract, paid the discount as "[c]harges imposed on [it] by [Mercury] for purchasing or accepting [plaintiffs'] obligation," and the plaintiffs neither paid cash to reimburse the discount to Gateway nor had such discount "deduct[ed] from the proceeds of the obligation." See 12 CFR § 226.4 (b) (6). The plaintiffs received a car and certain intangible property but no cash. The discount was imposed after the obligation became fixed, and Gateway received cash for sale of the loan obligation at a discount to its chose in action. The discount was not separately imposed by the creditor on the plaintiffs.

The seller-creditor, Gateway, paid a discount on the assignment of the credit obligation to Mercury, which discount was not imposed on the plaintiffs; thus, the discount fee was not a finance charge but was the cost of doing business. See 12 CFR § 226.4 (b) (6). "Charges absorbed by the creditor as a cost of doing business are not finance charges, even though the creditor may take such costs into consideration in determining the interest rate to be charged or the cash price of the property or services sold. However, if the creditor separately imposes a charge on the consumer to cover certain costs, the charge is a finance charge if it otherwise meets the definition." 12 CFR § 226.4 (a) (2).

Under the facts of this case, prior to the financing, the cash price for the car and services sold had been fixed, and the discount fee was subsequently imposed without reference to the financing costs.

Gateway, prior to the execution of the contract with the plaintiffs, was free to strike the assignment clause to Mercury in the form contract, keep the chattel paper and security interest, or sell such

chattel paper to another at whatever price that Gateway could negotiate. By having the plaintiffs execute the contract which provided automatic assignment to Mercury, Gateway accepted the oral offer and promise to pay from Mercury for the purchase of the chattel paper at a $450 discount. Because Gateway acted on its own behalf and on behalf of Mercury in the financing transaction and assignment of the chattel paper of the plaintiffs, such transaction, unknown to the plaintiffs, did not convert such $450 proceeds of the sale of tangible and intangible property rights into finance charges, either directly or indirectly. See 15 USCS §§ 1601, 1605, 1631, 1638; 12 CFR § 226.4 (a) and (b); *Perino v. Mercury Finance Co.*, 912 FSupp. 313 (N.D. Ill. 1995); *April v. Union Mtg. Co.,* 709 FSupp. 809, 813-814 (N.D. Ill. 1989). The trial court did not err in finding that the discount fee was not a finance charge but was a discount deducted from the sale of intangible property, i.e., the chattel paper.

2. The plaintiffs' second enumeration of error is that the trial court erred in finding as a matter of law on summary judgment that the Fair Business Practices Act ("FBPA") did not apply, because the transaction was "essentially private." We do not agree.

The discount was part of a private transaction between Gateway and Mercury, where Gateway paid Mercury a discount to take the assignment of the chattel paper and to pay Gateway cash. There is no evidence, that, absent such transaction, the plaintiffs could have purchased or financed for $450 less. Therefore, such transaction between the defendants was not a consumer transaction and had no causal effect on the plaintiffs.

The purpose of the Georgia FBPA is to protect consumers against that limited class in conduct of consumer transactions and consumer acts or practices in trade or commerce which involve "unfair and deceptive practices" within the consumer marketplace. See OCGA § 10-1-391 (a); *Eason Publications v. Nationsbank of Ga.*, 217 Ga. App. 726, 729-730 (2) (458 SE2d 899) (1995); *Larson v. Tandy Corp.*, 187 Ga. App. 893, 896 (4) (371 SE2d 663) (1988); *Zeeman v. Black*, 156 Ga. App. 82, 83-85 (273 SE2d 910) (1980); *Standish v. Hub Motor Co.*, 149 Ga. App. 365, 366 (254 SE2d 416) (1979).

In determining the applicability of the FBPA, "two factors are determinative: (a) the medium through which the act or practice is introduced into the stream of commerce; and (b) the market on which the act or practice is reasonably intended to impact. It is only when the application of both of those factors indicates that the act or practice occurred within the context of the consumer marketplace that the fairness or deceptiveness of the act or practice need be examined. This is so because an act or practice which is outside that context, no matter how unfair or deceptive, is not directly regulated by the FBPA." *Benchmark Carpet Mills v. Fiber Indus.;* 168 Ga. App. 932,

934 (311 SE2d 216) (1983); see also *Larson v. Tandy Corp.*, supra at 896; *Zeeman v. Black*, supra at 85; *State of Ga. v. Meredith Chevrolet*, 145 Ga. App. 8, 12 (244 SE2d 15) (1978).

While both Gateway and Mercury are in business in the marketplace, no public advertisement or misrepresentations regarding a discount fee or the absence of a discount fee were made for the plaintiffs to rely upon to their detriment. The failure to disclose the discount fee, which did not affect either the cost of sale or financing, did not impact any consumer market, and was not introduced into the stream of commerce. There must be both causation and injury. *Zeeman v. Black*, supra at 86-87; *State of Ga. v. Meredith Chevrolet*, supra at 11-14.

Any essentially private transaction falls outside the protection of the FBPA, because the FBPA seeks to prohibit public conduct in the market that is unfair or deceptive, that has actual or potential harm to the consumer public, and that encourages consumer transactions as a consequence of such prohibited conduct. *Medley v. Boomershine Pontiac-GMC Truck*, 214 Ga. App. 795, 796 (2) (449 SE2d 128) (1994); *Condon v. Kunse*, 208 Ga. App. 856, 859 (5) (432 SE2d 266) (1993); *Rivergate Corp. v. McIntosh*, 205 Ga. App. 189, 192 (421 SE2d 737) (1992); *Borden v. Pope Jeep-Eagle*, 200 Ga. App. 176, 178 (1) (407 SE2d 128) (1991); *Waller v. Scheer*, 175 Ga. App. 1, 4 (1) (332 SE2d 293) (1985); *Zeeman v. Black*, supra at 83.

Absent a showing of actual or potential harm to the plaintiffs, as consumers, by the practice of the discount to Mercury, there is no standing to bring an action under the Act on the basis of non-disclosure. *Zeeman v. Black*, supra at 84. The FBPA does not "provide an additional remedy for private wrongs which do not and could not affect the consuming public generally." Id. at 82-83; *Larson v. Tandy Corp.*, supra at 896. Further, plaintiffs were not induced to enter into a consumer transaction as a consequence of the defendants' acts or non-disclosure; the plaintiffs already had agreed to purchase the used vehicle and other intangible rights prior to the discount being negotiated between the defendants outside the plaintiffs' knowledge.

" 'Consumer transactions' means the sale, purchase, lease, or rental of goods, services, or property, real or personal, primarily for personal, family, or household purposes." OCGA § 10-1-392 (a) (3). " 'Consumer acts or practices' means acts or practices intended to encourage consumer transactions." OCGA § 10-1-392 (a) (2.1). The giving of a discount by Gateway to induce Mercury to assume the loan did not constitute "unfair or deceptive acts or practices in the conduct of consumer transactions," because the plaintiffs lacked knowledge of the discount, the discount did not affect the plaintiffs, the discount was a private transaction, and the discount was not part

of the consumer market. See OCGA § 10-1-393 (a); *Zeeman v. Black*, supra.

The General Assembly intended that the Georgia FBPA have a restricted application only to the unregulated consumer marketplace and that FBPA not apply in regulated areas of activity, because regulatory agencies provide protection or the ability to protect against the known evils in the area of the agency's expertise. OCGA § 10-1-396 (1) provides that the FBPA shall not "apply to . . . [a]ctions or transactions specifically authorized under laws administered by or rules and regulations promulgated by any regulatory agency of this state or the United States." TILA provides for federal preemption of state laws which "require[ ] a creditor to make disclosures or take actions that contradict the requirement of the federal law." 15 USCS § 1610; 12 CFR § 226.28 (a) (1). TILA provides for the determination, calculation, and disclosure of finance charges. The Federal Reserve Board promulgated Regulation Z that regulates finance charges and disclosure by lenders. See 12 CFR §§ 226.4 and 226.5. Thus, this area of finance charges, disclosure, and truth in lending falls outside the FBPA, except where expressly covered. OCGA § 10-1-396 (1).

3. The plaintiffs' third enumeration of error is that the trial court erred in granting summary judgment as to the Used Motor Vehicle Dealers & Used Motor Vehicle Parts Dealers Act ("Act") which, as a remedial act, should be applied retrospectively. We do not agree.

The Act is a licensing and regulatory act applicable to dealers in used vehicles and used vehicle parts and gives no cause of action to the plaintiffs for relief against either defendant. OCGA § 43-47-1 et seq.

Under the definition section, Gateway, as a franchised motor vehicle dealer, is expressly excluded from coverage by the Act; while Mercury could come under "[f]inancial institution," it would be excluded from coverage in this case, because Gateway does not come under the Act. OCGA § 43-47-2 (17) (B); see generally *Ga. Franchise Practices Comm. v. Massey-Ferguson, Inc.*, 244 Ga. 800, 802-803 (5) (262 SE2d 106) (1979); *Toirkens v. Willett Toyota,* 192 Ga. App. 109, 110 (1) (384 SE2d 218) (1989). Since the Act gives no relief to the plaintiffs in court and the defendants do not come within the Act, then the trial court did not err in granting summary judgment to both defendants.

4. The plaintiffs' final enumeration of error is that the trial court erred in granting summary judgment on Count 3, fraud and deceit.

Plaintiffs give no reference to the record, cite no authority, and make no argument, except to reference the argument and citation of authority in their first enumeration of error. Therefore, under Court of Appeals Rule 27 (c) (2), this Court deems said claim of error abandoned. *Maner v. State*, 221 Ga. App. 826, 830 (4) (472 SE2d 716) (1996); *Redwing Carriers v. Knight*, 143 Ga. App. 668, 676 (11) (239

SE2d 686) (1977); *Haskins v. Jones*, 142 Ga. App. 153 (1) (235 SE2d 630) (1977).

*Judgment affirmed. McMurray, P. J., and Blackburn, J., concur.*

DECIDED JUNE 22, 1998.

Barnes, Browning, Tanksley & Casurella, Roy E. Barnes, Michael K. Jablonski, John R. Bevis, Neal H. Howard, for appellants.

Denney, Pease, Allison & Kirk, Ray L. Allison, Page, Scrantom, Sprouse, Tucker & Ford, W. G. Scrantom, Jr., George G. Boyd, Jr., for appellees.